IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| WBE COMPANY, INC., | ) | |
| | ) | CASE NO. BK06-80006 |
| Debtor(s). | ) | A06-8040 |
| WBE COMPANY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | CH. 11 |
| | ) | |
| vs. | ) | |
| | ) | |
| ENTERPRISE BANK, N.A., and | ) | |
| MATT MOYER, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER

This matter is before the court on the defendants' motion for summary judgment (Fil. #176) and resistance by the plaintiff (Fil. #240). K.C. Engdahl represents WBE Company, and Andrew Muller, Mark Shaiken, and Scott Meyerson represent Enterprise Bank and Matt Moyer. The motion was taken under advisement as submitted without oral arguments.

The second amended complaint in this adversary proceeding alleges that Enterprise Bank and its president, Matt Moyer, breached fiduciary duties owed to the debtor by exercising control over the debtor's financial dealings, interfering with the debtor's business dealings, and self-dealing, and as a result caused financial harm to the debtor. The defendants move for summary judgment, arguing that they owed no fiduciary duty to the plaintiff and the complaint therefore rests on a faulty premise.

Nebraska law contains the presumption that a lender-borrower relationship ordinarily does not constitute a fiduciary relationship:

> [The plaintiff's] assertion [regarding a fiduciary duty owed by the defendant banks], moreover, contrasts sharply with the presumption under Nebraska law that ordinarily "the relationship between a bank and a customer . . . imposes no fiduciary duty upon the bank." Chase v. Deneau, 1993 WL 70947, at *2 (Neb. Ct. App. Mar.16, 1993); see also Bloomfield v. Nebraska State Bank, 237 Neb. 89, 465 N.W.2d 144, 149 (1991) (no fiduciary relationship even where bank was nearly in complete control of customer's financing ability); Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank, 934 F.2d 976, 984 (8th Cir. 1991) (construing Bloomfield to hold that bank did not owe fiduciary duty to customer whom it advised in business and financial matters); Nelson v. Production Credit Ass'n of the Midlands, 729 F. Supp. 677, 685

(D. Neb. 1989) (no fiduciary duty owed by credit association to its borrowers), aff'd, 930 F.2d 599 (8th Cir.), cert. denied, 502 U.S. 957, 112 S. Ct. 417, 116 L. Ed. 2d 438 (1991); cf. Wright & Souza, Inc. v. DM Properties, 1 Neb. App. 822, 510 N.W.2d 413, 417 (1993) (no agency, and hence no fiduciary relationship, where loan brokerage service agreed to obtain financing for real estate developer).

McCormack v. Citibank, N.A., 100 F.3d 532, 540-41 (8th Cir. 1996).

A plaintiff may be able to rebut that presumption under certain circumstances, however:

This presumption can be rebutted when (1) a customer "who is in a position of inequality, dependence, weakness, or lack of knowledge reposes trust or confidence in his or her banker" and (2) "the relationship results in the bank's dominion, control, or influence" over the affairs of the customer. Chase, at *2 (citing Garrett v. BankWest, Inc., 459 N.W.2d 833, 838-39 (S.D. 1990) (applying similar standard to find that bank owed no fiduciary duty to one of its customers, an experienced businessman-rancher-farmer)); accord Bloomfield, 465 N.W.2d at 149 ("[S]uperiority alone does not create a fiduciary duty. There must also be an opportunity to influence.").

Id. at 541.

The evidence shows that Scott Wiekhorst, general manager of WBE, had a close professional and personal relationship with Matt Moyer. Mr. Moyer had been WBE's banker since the early 1990s. He convinced the Wiekhorsts to transfer WBE's loans from its previous bank in 2003 when Mr. Moyer left that bank and joined Enterprise Bank. The men met for weekly dinners at which WBE's business prospects, goals, and financial situation, among other topics, were discussed. They and their families socialized together. In 2004, when WBE had borrowed the maximum amount Enterprise could legally lend, Mr. Moyer arranged for and personally guaranteed and subsequently paid a $400,000 loan for WBE from Heritage Group, Inc., a bank holding company in which Mr. Moyer holds a small ownership interest.

In the latter part of 2004, WBE became unable to work on public contracts, which had constituted the bulk of its jobs. Enterprise Bank began taking steps to collect on the WBE loans. WBE signed an agreement with Heritage Bank, a bank owned by Heritage Group, Inc., and operated by Mr. Moyer's brother Sam, to market WBE assets. A suitable individual buyer for WBE's pipe plant emerged, but the offer to purchase came from that individual and a group of investors represented by Heritage Bank. Matt Moyer was not a member of that group. Attorneys for both sides negotiated various terms of the sale, but disagreements over requested non-compete agreements and the allocation of the proceeds prevented the consummation of the transaction.

At the same time, Mr. Wiekhorst began negotiating, through his leasing company Heavy Iron Leasing Company, to sell WBE's portable concrete plant. That sale did not go through because Enterprise held a lien on the plant, which it was unwilling to release unless it received the sale

proceeds. Mr. Wiekhorst wanted the funds sent to another bank. Because the prospective purchaser received conflicting information about whether WBE or Heavy Iron owned the plant, as well as to what extent Enterprise Bank had an interest in the asset, the prospective purchaser declined to go forward with the transaction.

By the latter part of 2005, Enterprise Bank began foreclosure proceedings against WBE's collateral, and WBE's bankruptcy petition soon followed.

WBE argues that Mr. Moyer's personal payment of the $400,000 loan and his subsequent involvement in trying to sell the company's assets violates a fiduciary duty. While there is a reference to the $400,000 cash infusion in a March 19, 2004, e-mail message from a bank officer to the bank's board of directors, with the statement that the "[f]unds were from a private investor and will eventually become a preferred stock instrument" (Pl.'s Ex. 9 (Fil. #240)), there is no evidence that Mr. Moyer actually received a stake in the company. He remained at best an unsecured creditor. His position as a creditor personally as well as a representative of the bank may or may not have put him in an awkward position as the bank was attempting to liquidate its collateral; presumably he and the bank were both hoping to realize sufficient proceeds to be paid. In the end, however, Mr. Wiekhorst was the final decision-maker regarding the terms of the sale of the pipe plant.

WBE also states that Enterprise Bank covered the checks when WBE overdrew its account, and argues that this constitutes an exercise of dominion and control over the company which established a fiduciary duty. However, there is no evidence this conduct was out of the ordinary for the bank and a large commercial borrower.

WBE also argues that Mr. Moyer attempted to influence the sale of WBE's assets and participated in both sides of the transaction, improperly disclosing WBE's financial information to Heritage Bank and pushing WBE to accept a deal. However, the fact that Mr. Wiekhorst refused to finalize the sale of the pipe plant to Dave Werner and the group of Heritage investors indicates that no one on behalf of the bank could influence or control WBE's decisions. Likewise, the potential purchaser of the portable concrete plant – recruited by Mr. Wiekhorst – stated that he was not comfortable with going forward with the transaction because of inconsistent information from WBE. The bank did not exercise any control over that transaction.

Another allegation at issue is WBE's suspicion that a member of a competitor company who sat on Enterprise Bank's board of directors was, as a result, privy to information concerning WBE's financial situation, despite WBE's request to the bank that no such information be disclosed to said individual. In March 2003, when WBE was preparing to transfer its loans to Enterprise Bank, a credit approval document was prepared for presentation to Enterprise Bank's loan committee and board of directors. The document contained a warning against disclosure of the information to the competitor:

> ***IMPORTANT***  The prospective company is a direct competitor of Charles Vrana Construction. The prospect has been assured that this request,

> **and anything associated with this request, will not be discussed or disclosed to any individual associated with Charles Vrana Construction.**

Credit Approval Presentation (Defs.' Ex. M (Fil. #190)).

Mr. Wiekhorst stated in deposition testimony that he was leery about moving WBE's business to Enterprise Bank because he knew that someone connected to Charles Vrana & Son Construction had an ownership interest in Enterprise Bank. At the time, WBE and Charles Vrana & Son Construction bid on the same projects, so Mr. Wiekhorst was concerned about Vrana obtaining financial information about WBE and putting WBE at a competitive disadvantage. Mr. Wiekhorst said Mr. Moyer assured him that Vrana "wouldn't even know that we were doing business there." Scott Wiekhorst Dep. 18:3-5 (Defs.' Ex. E (Fil. #182)). Mr. Wiekhorst believed that the warning language on the credit approval documents reflected Mr. Moyer's intention that at no time would the director from the Vrana company review, discuss, or in any way be aware of bank business that concerned WBE's loans.

Troy Perry, the board member from the Vrana company, testified in depositions that Mr. Perry did not know that WBE had become a customer of Enterprise Bank until after the fact. When he asked why he had not been included in the decision, he was told that a condition of the arrangement between the bank and WBE was that he not be involved in decisions concerning WBE. Mr. Moyer and Mr. Perry both testified that Mr. Perry was not involved in any substantive board discussions of WBE's financial situation, and that Mr. Perry merely received the lists of loans that were regularly distributed to board members for informational purposes. There is no evidence that WBE suffered a detriment due to Mr. Perry's presence on the bank board. It is unclear how the allegations concerning Mr. Perry's knowledge of WBE's loan status might constitute a breach of a fiduciary duty.

Scott Wiekhorst handled WBE's business operations and finances. He is a sophisticated businessman, with a college education and 30 years of experience in the construction industry, including 25 years of owning and/or operating a construction business. As mentioned above, he on behalf of WBE had a long banking relationship with Mr. Moyer at a number of financial institutions. In addition to his position with WBE and with Heavy Iron Leasing, he also has an ownership interest in several companies related to the construction business. While it is certainly reasonable to believe that he valued Mr. Moyer's financial expertise and his input on WBE's business and financial decisions, it is patently unreasonable to believe that Mr. Wiekhorst was so financially illiterate, weak-minded, or dependent that he placed complete trust and confidence in Mr. Moyer and thereby created such an unequal relationship that Mr. Moyer, or the bank he represented, owed WBE a fiduciary duty.

The defendants' brief quotes language from <u>Cosoff v. Rodman (In re W.T. Grant Co.)</u>, 699 F.2d 599 (2d Cir.), <u>cert. denied</u>, 464 U.S. 822 (1983), a case in which the debtor claimed that its lenders used their "position of control" over the debtor's management to preclude the company from filing bankruptcy while strengthening the banks' security position and allowing preference recovery periods to run. The circuit court affirmed the bankruptcy judge's decision to give little weight to the

allegations that the banks were "running" the debtor's business, noting that the banks had a duty to their own creditors and shareholder to keep a close eye on the debtor as its financial situation deteriorated. One of the court's observations seems particularly applicable here:

> It is not uncommon in such situations for officers whose companies have been brought to the verge of disaster to think that they still have better answers than do the outsiders. In order to establish their claims the appellants must show not simply that the banks proffered advice to Grant that was unpalatable to management, even advice gloved with an implicit threat that, unless it were taken, further loans would not be forthcoming. They must show at least that the banks acted solely for their own benefit . . . and adversely to the interest of others.

699 F.2d at 610-11.

WBE's brief makes clear that WBE expected Mr. Moyer to be an advocate for it, both with the bank in attempting to get additional loan approvals and with the investor group negotiating the purchase of the pipe plant in attempting to gain concessions for WBE from the buyers. The personal relationship between the Wiekhorsts and Mr. Moyer blurred the boundaries of the professional relationship, and this lawsuit appears to have arisen from the Wiekhorsts' unreasonable expectation that Mr. Moyer would intervene on their behalf as WBE's troubles mounted. At that point, however, the goals of the bank and Mr. Moyer in collecting the bank's loans differed from WBE's goals of continuing to operate, which left the Wiekhorsts feeling betrayed.

WBE was struggling, and the bank had a duty to protect itself. The fact that the principal decision-makers of each entity were personal friends made the necessary actions more difficult, but does not affect the nature of the relationship between the parties as a standard commercial-lending relationship. Mr. Moyer's position as a friend did not imbue the professional relationship with fiduciary status.

Summary judgment is appropriate only if the record, when viewed in the light most favorable to the non-moving party, shows there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (made applicable to adversary proceedings in bankruptcy by Fed. R. Bankr. P. 7056); see, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Aviation Charter, Inc. v. Aviation Research Group/US, 416 F.3d 864, 868 (8th Cir. 2005); Ferris, Baker Watts, Inc. v. Stephenson (In re MJK Clearing, Inc.), 371 F.3d 397, 401 (8th Cir. 2004).

In ruling on a motion for summary judgment, the court must view the facts in the light most favorable to the party opposing the motion and give that party the benefit of all reasonable inferences to be drawn from the record. Widoe v. District No. 111 Otoe County Sch., 147 F.3d 726, 728 (8th Cir. 1998); Ghane v. West, 148 F.3d 979, 981 (8th Cir. 1998). A summary judgment motion should be interpreted by the court to dispose of factually unsupported claims and defenses. Tiffey v. Speck Enter., Ltd., 418 F. Supp. 2d 1120, 1123 (S.D. Iowa 2006).

Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52. Moreover, although under Federal Rule of Civil Procedure 56 due deference must be given to the rights of litigants to have their claims adjudicated by the appropriate finder of fact, equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy and inexpensive determination of the action where the claims have no factual basis. Celotex Corp. v. Catrett, 477 U.S. at 327.

In this case, there are no genuine issues of material fact.[1] The plaintiff is unable to establish the existence of a fiduciary relationship with either of the defendants. Accordingly, summary judgment will be granted.

IT IS ORDERED: The defendants' motion for summary judgment (Fil. #176) is granted. Separate judgment will be entered.

DATED:    April 24, 2007

BY THE COURT:

/s/ Timothy J. Mahoney
Chief Judge

Notice given by the Court to:
K.C. Engdahl
*Andrew Muller
Mark Shaiken
Scott Meyerson
U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.

---

[1] The defendants' briefs discuss a matter concerning terms of an alleged agreement written on a "whiteboard" during negotiations for the sale of the pipe plant. The plaintiff's brief indicates that WBE is not pursuing that as a separate allegation but is simply using it as additional evidence of Mr. Moyer's "analysis and recommendations" to WBE which were part of the alleged fiduciary relationship. Therefore, the whiteboard will not be addressed further in this order.